## NATIONAL AMERICAN INSURANCE COMPANY OF CALIFORNIA, Plaintiff–Appellee,

v.

**CERTAIN UNDERWRITERS AT LLOYD'S LONDON, subscribing to the reinsurance agreements represented by certificates number LC 58392 and LC 103204, Defendant,**

and

**Smith and Companies, Defendant–Appellant.**

No. 94–55047.

United States Court of Appeals, Ninth Circuit.

Submitted May 3, 1995.*

Decided June 30, 1995.

Amended Aug. 24, 1995.

Argued and Submitted May 14, 1996.

Opinion Withdrawn Aug. 15, 1996.

Decided Aug. 15, 1996.

ment. Fed. R.App. P. 34(a); 9th Cir. R. 34–4.

George J. Koelzer, Lane Powell Spears Lubersky, Los Angeles, California, for defendant-appellant.

Linda M. Lasley, Reinsurance Counsel, A Law Corporation, Pasadena, California, for plaintiff-appellee.

Before BEEZER and TROTT, Circuit Judges, and SHUBB,** District Judge.

## ORDER

The opinion filed June 30, 1995 and amended August 24, 1995 is withdrawn.

## OPINION

SHUBB, District Judge:

In July 1991, National American Insurance Company of California ("National") brought this diversity action in the district court to collect on two reinsurance policies issued in the early 1960's by various underwriters at Lloyd's, London (collectively the "Underwriters"). The Underwriters appeal from a summary judgment awarding National approximately $2,930,325, plus pre-judgment interest.[1] We affirm in part, and reverse in part.

## I.

National is the successor in interest of the Stuyvesant Insurance Company ("Stuyvesant"). In the early 1960's, Stuyvesant sold liability insurance to the Hughes Aircraft

Company ("Hughes"), which from 1951 until the mid 1970's operated a manufacturing plant near the Tucson International Airport. This insurance was brokered by Haidinger–Hayes, Inc. ("Haidinger"), which also sold and serviced insurance and reinsurance for the Underwriters.

This insurance covered the years 1962, 1963 and 1964. In all three years, Hughes purchased $1 million in liability coverage from Haidinger. As originally structured, the first $500,000 of each year's coverage was under a primary policy from Stuyvesant.[2] The additional $500,000 in coverage was provided by an excess insurance policy issued by Haidinger on behalf of the Underwriters.[3]

The structure of these polices was altered commencing with the second year of coverage. Effective January 1, 1963, Stuyvesant's primary coverage of Hughes increased to the full $1 million, and in response Haidinger converted the Underwriters' $500,000 excess policy covering Hughes into a $500,000 reinsurance policy covering Stuyvesant.[4] As with the excess insurance policy, the Underwriters' liability to Stuyvesant was not triggered until Stuyvesant's liability to Hughes under the primary policy exceeded $500,000. In addition to the converted excess insurance policy,[5] Stuyvesant also purchased another $150,000 of reinsurance coverage from the Underwriters for 1964. This coverage would activate as soon as any claim by Hughes under the primary policy exceeded $350,000 for that year.[6]

Hughes eventually made a full claim against the Stuyvesant primary policy for all three years of coverage. While operating its

** Honorable William B. Shubb, Chief United States District Judge for the Eastern District of California, sitting by designation.

1. Of the total amount awarded, $1.15 million represents direct liability under the polices. $1.16 million represents the Underwriters' share of the adjustment costs incurred by National in investigating and defending against the primary claim. The balance is interest.

2. The policy number was CGB 1060672. It provided Hughes with general liability insurance, and coverage against other specified risks.

3. Haidinger was authorized to sell the excess insurance on behalf of the Underwriters pursuant to a contract entitled NMC 592 (the "Binding Authority").

4. "Reinsurance" is a means by which insurance companies spread their exposure to risk. One commentator defines reinsurance as:

the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss.

13A Appelman, Insurance Law and Practice § 7681 at 480 (1976).

5. The policy number of the converted excess insurance is LC 58392.

6. This policy number of this second policy is LC 103204.

manufacturing plant, Hughes had apparently disposed of considerable amounts of toxic waste. In 1985, residents living near the Tucson airport brought suit against Hughes (the "Valenzuela litigation"). In 1986, Hughes tendered the defense of the Valenzuela litigation to its primary insurers, among them, National and the Underwriters.[7] Ultimately, Hughes settled with the class for about $84 million. Hughes' insurers agreed to pay approximately $72 million of this. National's share was $2.5 million. The Underwriters' share was more than $26 million.

At the time the Valenzuela litigation commenced, National was unaware of the reinsurance policies. However, National suspected that the policies might exist and began searching for them. In the end this search led to Stewart Smith West, Inc., Haidinger's successor in interest.[8] On May 22, 1989, several years after National had undertaken its role in Hughes' defense, but several years before any settlement was reached, Stewart Smith West sent National copies of the certificates representing the two reinsurance policies. Nine days later, National sent a letter to Stewart Smith West giving them preliminary notice of a possible claim against the policies. By then, National had already incurred legal and investigation costs of approximately $1.8 million. This was also communicated to Stewart Smith West in the letter.

Neither Stewart Smith West nor the Underwriters responded to the May letter or to subsequent letters. On January 9, 1991, National informed Stewart Smith West of the terms of the settlement agreement. Again, there was no response. On January 10, 1991, National paid the full $2.5 million to Hughes. On January 25, 1991, National submitted its claim to Stewart Smith West under the reinsurance policies. National sought $1.15 million in liability coverage under the 1963 and 1964 policies, and an additional amount as the Underwriters' share of the associated costs. Stewart Smith West and the Underwriters maintained their silence until July, 1991, when National brought this action in the district court.

## II.

■ We review the granting of summary judgment de novo, applying the same standard as the district court. *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir.1995). Summary judgment is appropriate if the record, read in the light most favorable to the non-moving party, demonstrates no genuine issue of material fact. *Celotex Corp., v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to the substantive law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The district court concluded California substantive law applies and the parties do not dispute this conclusion.

In this appeal, the Underwriters contend that material disputes of fact exist on the following issues: (1) whether valid reinsurance policies were ever in effect; (2) assuming there were, whether the Underwriters are liable under the policies; (3) whether National's alleged failure to give timely notice precludes it from recovering under the policies; (4) whether National's failure to obtain the Underwriter's written consent precludes it from recovering a pro rata share of the costs incurred in investigating and settling Hughes' claim; and (5) whether the court below erred in ordering the Underwriters to produce certain documents.[9] We address each argument in turn.

---

7. In addition to writing reinsurance, the Underwriters were also direct insurers of Hughes under various excess liability policies.

8. In August 1964, Stewart Smith Haidinger, Inc. succeeded Haidinger–Hayes, Inc. as the Underwriters' agent in Los Angeles. In 1980, Stewart

Smith Haidinger changed its name to Stewart Smith West, Inc., its name today.

9. The Underwriters raise an additional argument, which we do not consider. In addition to appealing the district court's award of summary judgment in favor of National, the Underwriters also appeal the denial of their motion for sum-

## III.

The district court correctly determined that there was no question of material fact going to the existence or terms of the two reinsurance policies. Under California law, the insured has the burden of proving both the existence of the insurance contract, and its material terms. *Searle v. Allstate Life Ins. Co.*, 38 Cal.3d 425, 438, 212 Cal. Rptr. 466, 696 P.2d 1308 (1985). National presented ample evidence to meet this burden.

### A. LC 58392

As to the first policy, LC 58392, National presented evidence demonstrating that it was originally issued to Hughes as excess insurance, and that Haidinger subsequently endorsed it on behalf of the Underwriters, thereby converting it into a $500,000 reinsurance policy covering Stuyvesant for the years 1963 and 1964.[10] Among the evidence produced by National were both the original excess insurance policy and the subsequent

endorsement. These two documents, when read together, contain all the terms essential to a valid contract of insurance under California law-(1) the parties, (2) the "property insured," (3) the risks insured against, (4) the period of coverage, and (5) the means of determining the amount of the premiums. *See* Cal. Ins. Code § 381.[11] Since the Underwriters produced no contradictory evidence, the district court correctly determined that they failed to raise a genuine issue of material fact as to the existence or the terms of LC 58392.

### B. LC 103204

The primary dispute regarding this second reinsurance policy is whether it was canceled in late 1964. The Underwriters contend that Haidinger canceled LC 103204 on November 11, 1964, and replaced it with another policy. However, the only evidence which supports this version of events is a cryptic series of telexes sent between Haidinger and London.[12]

---

mary judgment. However, they offer neither argument nor authority in support of this aspect of their appeal, and it will not be considered. *See Wingate v. Bercut*, 146 F.2d 725, 729 (9th Cir. 1944); *American Airlines v. Christensen*, 967 F.2d 410, 415 n. 8 (10th Cir.1992).

10. National offered the following evidence pertaining to LC 58392: (1) the original certificate of the excess insurance issued to Hughes for 1962–65, including the policy terms; (2) an endorsement attached to LC 58392, dated July 26, 1963, which converted Hughes' excess insurance into reinsurance of Stuyvesant; (3) a letter to National from E.F. Casey, then the President of Stewart Smith West, accompanying both the original policy and the endorsement, stating, "You will notice that the certificates issued to Hughes direct were changed to reinsurance of Stuyvesant by endorsement;" (4) the declaration of George Gibbs, an employee of Haidinger–Hayes in 1964, and later the president of Stewart Smith Haidinger and Stewart Smith West, stating that "LC 58392 was amended by endorsement to be reinsurance of Stuyvesant, in respect of the Hughes Primary Policy;" and (5) internal documents of Stewart Smith West referring to the reinsurance of Stuyvesant under LC 58392.

11. The Underwriters also argue that National was required under California law to prove the terms of the reinsurance contract by clear and convincing evidence. Their position is without authority. The Underwriters cite a 1926 case holding that such a heightened burden applies to a lost deed. *Murray v. Guarantee Trust & Sav.*

*Bank*, 79 Cal.App. 69, 76, 248 P. 1039 (1926). However, this rule has not been extended to lost insurance policies. Indeed, a case decided shortly after *Murray*, which did involve a lost insurance policy, made no mention of a heightened evidentiary burden. *Clendenin v. Benson*, 117 Cal.App. 674, 678, 4 P.2d 616 (1931). Further, the policy at issue here is *not* lost. National produced it, along with enough supporting documentation to satisfy even the higher evidentiary burden.

12. The first was sent on October 21, 1964 ("21.10.64") from Haidinger to London and reads:

bowden confidential hughes aircraft tool companies avl84/262/185/262 when central national reinsured stuyvesant 100 percent effective 1 January 1964 as part overall portfolio transfer of haidinger hayes business we inadvertently failed arrange 100 percent reinsurance primary 500,000 aviation products thereby reinsuring all aviation exposures which excluded from central national treaties stop we bound under nmc 592 150,000 excess 350,000 refer lc 103204 however feel best you arrange 100 percent reinsurance primary 500,000 and lc 103204 canceled stop please confirm arranged tomorrow as must advise vmh who in omaha at central national home office

The next day London responded with the following:

hughes hl494 ok leader willing reinstate primary [illegible] 500,000 products from 21 Oc-

Standing alone, and read in the light most favorable to the Underwriters, the most these telexes show is that discussions were held *about* canceling LC 103204. This, by itself, is insufficient as a matter of law to raise a triable issue of fact as to whether the policy was ever actually canceled. Moreover, these telexes do not stand alone. According to the deposition testimony of Gibbs,[13] who sent the initial telex from Los Angeles, the concern underlying the 1964 telexes went solely to the aviation portion of the Stuyvesant policy.[14] No discussion was ever held about canceling the general liability coverage of LC 103204. Since it is undisputed that Hughes made its claim under its general liability coverage, the fact that the Underwriters may have considered canceling the aviation portion of LC 103204 is immaterial. The district court correctly determined that there was no genuine dispute over whether LC 103204 was in effect in 1964.

### IV.

■ The Underwriters next argue that National must prove the existence of coverage on the Hughes primary policy to prevail on its claim that there was coverage on any policies of reinsurance. Essentially, the Underwriters claim the right to litigate the question of whether National was liable to Hughes under the primary policy.

The district court granted summary judgment against the Underwriters on this issue, finding that the reinsurance "follow the settlements" doctrine applied even though no such clause was contained in the controlling policy.

■ As its label implies, the "follow the settlements"[15] doctrine prevents facultative reinsurers "from second guessing good-faith settlements and obtaining de novo review of judgments of the reinsured's liability to its insured." *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995). *E.g.*, *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992) ("Under the 'follow the fortunes' doctrine, a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it. A reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled." (citations omitted)); *Aetna Casualty & Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1328, 1346–47 (S.D.N.Y. 1995) ("*Aetna I*") ("subject to the requirements of good faith and a reasonable, businesslike investigation, the ceding company may bind the reinsurer to follow its settlement fortunes when it concedes that a particular claim falls within the scope of coverage....").

The "follow the settlements" doctrine reflected in these cases apparently is now explicitly included in most reinsurance policies. *See Bellefonte Reinsurance Co. v. Aetna Casualty & Sur. Co.*, 903 F.2d 910, 912 (2d Cir.1990). As mentioned, however, no such clause appeared in the certificates in this case.

In the absence of an explicit "follow the settlements" clause, National argued below

---

tober seeing remainder market and adising [sic] new rates and premiums tomorrow

And the day after London concluded the dialogue with this:

hughes av185/162 majority (illegible) as follows limits as requested premium prorata 5,000 additional minimum per annum adjusted at 7.5 cents per 1,000 sales stop hami av184/262 limits as requested premium prorata 833 additional minimum per annum adjusted 7.5 cents per 1,000 butsales civilian helicopters 37.5 cents per 1,000 military 7.5 cents per 1,000 stop both placings subject claims control clause will advise completion soonest

13. In 1964, Gibbs was an employee of Haidinger–Hughes familiar with the two policies. He later became president of Stewart Smith Haidinger, Inc. and Stewart Smith West.

14. Stuyvesant underwrote both general liability and aviation risks in its policy with Hughes. According to Gibbs, it would not be unusual for an insurer like Stuyvesant to place different portions of the insurance policy with different reinsurers. Though Gibbs is not certain whether this was ever done, as he recalls it, the subject of the telexes was whether to place the aviation portion of LC 103204 with another reinsurer.

15. The parties differ on the extent to which the "follow the fortunes" doctrine differs from the "follow the settlements" doctrine. We do not attempt to resolve this dispute.

that such a clause should be implied based on industry custom and usage. It presented expert declaration testimony that at the time the certificates were entered into such clauses were widely understood within the reinsurance industry to be a tacit part of every facultative reinsurance agreement. In contrast, the Underwriters argued that controlling *law* on this subject required an explicit "follow the settlements" clause in the certificates and precluded custom and usage evidence to the contrary. We address the Underwriters' argument first.

The Underwriters' argument derives from the rule that "the original assurers must, in a suit brought against the reassurers, establish the same facts, as would entitle the assured to recover upon the original policy." *New York State Marine Ins. Co. v. Protection Ins. Co.*, 18 F. Cas. 160, 161 (C.C.Mass.1841). This articulation by then-Judge Story of the state of law on this subject appears to have survived for many years. In 1920, the California Supreme Court reiterated in dictum that absent such a clause in the reinsurance contract, a reinsurer has the right to assert those coverage defenses that might have been available to the reinsured against the insured at the time of settlement. *Royal Ins. Co. v. Caledonian Ins. Co.*, 182 Cal. 219, 224–26, 187 P. 748 (1920); *see also Pacific Mut. Life Ins. Co. v. Pacific Sur. Co.*, 69 Cal.App. 730, 734, 232 P. 728 (1924) (also dictum). We accept as true, for purposes of this analysis, that such dictum accurately portrays the common law rule in California.

We do not, however, accept the Underwriters' further contention that this rule precludes evidence of custom and usage to the contrary. Properly framed, the Underwriters' argument is really a variation on the principle that custom and usage evidence cannot overcome a contrary rule of law. *See generally* 1 Bernard Witkin, *Summary of California Law, Contracts,* § 696 at 630 (9th ed. 1987) (and cases cited therein). The Underwriters' argument fails for two reasons.

■ First, the Underwriters have not pointed to a single California case where a court applied this principle to preclude evidence of custom and usage contrary to *common law*. Instead, the cases deal mainly

with usages contrary to "positive" *statutory* law. *See, e.g., Hayward Tamkin & Co. v. Carpenteria Inv. Co.*, 265 Cal.App.2d 617, 624, 71 Cal.Rptr. 462 (1968); *Kohn v. Sacramento Elec. Gas & Ry. Co.*, 168 Cal. 1, 7, 141 P. 626 (1914). The rationale for applying such a rule to statutes is imminently defensible: courts should not use evidence of custom and usage to evade a legislative enactment. *Crocker Nat'l Bank v. Byrne & McDonnell,* 178 Cal. 329, 334, 173 P. 752 (1918).

The principle that custom or usage cannot overcome a rule of law applies with less force when, as here, the law derives not from statute, but from the common law. "[O]bjection on the ground of contrariety to the general or common law is entitled to little weight where the custom or usage assailed embraces an entire business, and has been concurred in for a long time by all persons engaged therein." 25 C.J.S. *Custom and Usages* § 10 (1966) (and cases cited therein) This distinction between statutory and common law is sound. The common law's "malleability to suit the necessities and usages of the mercantile and commercial world," is one of its most valuable characteristics. *Mercer County v. Hackett,* 68 U.S. (1 Wall.) 83, 95, 17 L.Ed. 548 (1863).

■ Second, even if applicable, the rule that custom or usage cannot overcome a contrary law is subject to an important qualification. Law that applies only in the absence of an agreement to the contrary does not preclude evidence of custom or usage. *Cf.* Cal. Com.Code § 1205 (UCC Cmt. 4) (West 1964) (custom and usage cannot overcome mandatory rules such as the statute of frauds but it can overcome rules that apply absent an explicit understanding); *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 795 (9th Cir.1981) (same); *see also Wolfe v. Texas Co.*, 83 F.2d 425, 431 & n. 6 (10th Cir.) ("where a rule of law is of a character that the parties may make it inapplicable to their contract by express agreement, they may likewise render it inapplicable by implied agreement or by usage"), *cert. denied,* 299 U.S. 553, 57 S.Ct. 15, 81 L.Ed. 407 (1936). Such is the nature of the rule of law here. At most, cases such as *Royal Ins. Co.* suggest only that in the absence of an agree-

ment to the contrary, the reinsurer does not have to follow the settlement. *Royal Ins. Co.*, 182 Cal. at 224, 187 P. 748. Because *Royal Ins. Co.* merely describes what occurs when no express understanding exists, it does not preclude evidence of custom or usage to the contrary. Whether such evidence exists in this case depends, as discussed below, on an unresolved factual question.

 In diversity cases, federal law determines whether an issue is one of law or fact. *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 n. 2 (9th Cir.1992). Under federal law, the existence of a custom or usage to "follow the settlements" is in the first instance a question of fact. *See Aetna I*, 882 F.Supp. at 1349; *see also Mentor Ins. Co. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir.1993) (custom or usage is a question of fact).[16]

Assuming, as a factual matter, a custom or usage to "follow the settlements" exists, then the custom or usage becomes part of the certificates if state law permits it. Under California law, insurance contracts are subject to the same basic rules of construction as other contracts. *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 666, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995) (holding that rules of construction applicable to contracts generally also govern insurance contracts); *Pacific Mut. Life Ins. Co.*, 69 Cal. App. at 734, 232 P. 728 (applying this rule in construing policy underlying reinsurance dispute). Ordinary rules of construction permit custom or usage evidence "both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract." *Varni Bros. Corp. v. Wine World, Inc.*, 35 Cal.App.4th 880, 889, 41 Cal.Rptr.2d 740 (1995) (quoting 1 Witkin, *supra*, § 696 at 629). "[A] reasonable usage may supply an omitted term or otherwise supplement an agreement." *Id.* (quoting 1 Witkin, *supra*, § 696 at 630); *see also* Cal. Civ. Code § 1655 (West 1985).

 Here, the parties agree the certificates do not include an explicit "follow the settlements" clause. National presented evidence that at the time the policies were entered into, "follow the settlement" clauses were widely understood by reinsurance industry custom and practice to be a tacit part of every facultative reinsurance agreement. Because the district court believed National's evidence had not been contradicted, it implied such a clause; and it concluded the Underwriters "must honor the cedent's settlement of contested claims, unless those settlements were the product of fraud, collusion, bad faith or were *ex gratia* in nature."

As we must, we have taken a fresh look at the record and conclude the Underwriters controverted National's evidence, albeit obliquely. Although the Underwriters have mainly emphasized the *Royal Ins. Co.* line of cases, they did offer the declaration of Mr. Hugh Dunlap, a self-styled expert in this arcane area. Mr. Dunlap opined that the "follow the settlements" doctrine did not apply to the certificates in this case. Another expert corroborated Mr. Dunlap's opinion.

This evidence creates a genuine issue of material fact whether there existed a custom or usage to "follow the settlements" at the time the certificates were made. We so conclude notwithstanding the Underwriters' tenacious reliance on "the law" in favor of their claim and their studied reluctance to advance Mr. Dunlap's declaration in their favor. Based on an assertive amicus brief filed by the Reinsurance Association of America after our original opinions in this case, and our own review of the record and cases, we now find a factual question as to whether there existed within the facultative insurance industry prior to the 1970's a custom or usage to "follow the settlements." Accordingly, a trial is necessary on this issue.

### V.

Both LC 58392 and LC 103204 contain provisions requiring National to give notice

---

16. The district court's finding that "established reinsurance industry custom and practice implies into every reinsurance contract an obligation for the reinsurer to 'follow the settlements' of its cedent" actually appears under

"Conclusions of Law." In this context, however, it is immaterial whether the district court labeled its finding as a conclusion of law. *Mentor Ins. Co.*, 996 F.2d at 513.

of potential claims to the Underwriters. LC 58392 provides that:

> Upon knowledge by the named Assured's insurance manager, or by another person designated by the named Assured to give notification of claims, of any occurrence likely to give rise to a claim hereunder, written notice thereof shall be given to Underwriters as soon as practicable.

LC 103204 provides that:

> The Company upon knowledge of any occurrence likely to give rise to a claim hereunder shall give immediate written advice thereof to the person(s) or firm named for the purpose in the schedule.

National first learned of the Valenzuela litigation in October, 1985. A year later, National and Hughes' other insurers, among them the Underwriters, agreed to take over Hughes' defense in the litigation. National did not learn of the existence of the reinsurance policies until May 22, 1989. On May 31, 1989, National sent a detailed letter to Stewart Smith West giving notice of potential claims under the reinsurance policies.

■ Under California law, a reinsurer may invoke the defense of late notice so long as it immediately objects to the late notice, and suffers "actual and substantial prejudice." *Insurance Co. of Pennsylvania v. Associated Int'l Ins. Co.*, 922 F.2d 516, 523 (9th Cir.1990). Cal. Ins. Code § 554 provides that "[d]elay in the presentation to an insurer of notice or proof of loss is waived, if caused by an act of his, or if he omits to make objection promptly and specifically on that ground."

■ The Underwriters begin by challenging the district court's determination that it was undisputed that Stewart Smith West was authorized to receive notice of potential claims on their behalf. Thus, they argue that they did not receive notice on May 31, 1989, as found by the district court. However, the district court's conclusion on this point is well supported in the record. It is undisputed that the reinsurance policies named Haidinger–Hayes as the agent for receiving notice of claims, and George Gibbs testified in his deposition that Stewart Smith Haidinger, which later changed its name to Stewart Smith West, succeeded Haidinger–Hayes as the Underwriters' claims agent. According to Gibbs, Stewart Smith West remains responsible for "servicing existing business previously written by Haidinger under the Binding Authority, including the reinsurance agreements LC 58392 and LC 103204." (Gibbs Decl. ¶ 8).

■ Despite receiving notice of the claim on May 31, 1989, the Underwriters did not object to such notice as untimely until after this suit was brought in July, 1991. The district court found that the Underwriters' delay constituted a waiver of any late notice defense they may have had. We agree. While "promptly" is not specifically defined in § 554, in *Ellgass v. Brotherhood of R.R. Trainmen Ins. Dep't*, 342 F.2d 1, 3 (9th Cir.) *cert. denied*, 381 U.S. 911, 85 S.Ct. 1536, 14 L.Ed.2d 434 (1965), "a clear case of waiver" was found where an insurance company delayed twenty months before objecting to a claim on the grounds that it was untimely. Here, the delay was more than two years. This is not a prompt objection by any definition.

■ Nor did the Underwriters make a sufficient showing that they suffered "substantial prejudice" from the late notice. Numerous California cases hold that where an insurer denies coverage, a strong presumption arises that it has not suffered prejudice from late notice. The reason is that if an insurer takes the position that it is not liable under the policy, as the Underwriters do here, then it experiences no prejudice by late notice—it merely denies coverage at a later date. *See, e.g., Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 762, 15 Cal.Rptr.2d 815 (1993); *Eichler Homes, Inc. v. Underwriters at Lloyd's, London*, 238 Cal. App.2d 532, 539, 47 Cal.Rptr. 843 (1965); *Comunale v. Traders & Gen. Ins. Co.*, 116 Cal.App.2d 198, 253 P.2d 495 (1953).

To overcome this presumption the Underwriters "must show a substantial likelihood that, with timely notice, and notwithstanding a denial of coverage or reservation of rights, it would have settled the claim for less or taken steps that would have reduced or eliminated the insured's liability." *Shell Oil*, 12

Cal.App.4th at 763, 15 Cal.Rptr.2d 815. The Underwriters contend that they showed such prejudice. Their position is that, had they been timely notified, they would have "recommended in the strongest terms" that National join in a declaratory relief action brought by a number of Hughes' insurers. On September 16, 1992, summary judgment was awarded in favor of a number of insurers who covered Hughes prior to 1971. So, the Underwriters argue, National's failure to give prompt notice deprived both National and the Underwriters of the benefits of the finding of no coverage that resulted from this litigation.

This argument is unavailing for several reasons. First, National knew of the declaratory relief action all along. it simply decided that the wiser and cheaper course was to settle. It is undisputed that under the reinsurance policies, National retained complete discretion in determining whether to settle a claim or not. And nothing presented by either party suggests that the Underwriters would have convinced National to decide otherwise. Second, the favorable order relied on by the Underwriters has since been reversed and remanded. *See Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1439–41 (9th Cir. 1993). Depending on the eventual outcome of that litigation and the associated litigation costs, it may very well prove that National's refusal to join the declaratory action *saved* the Underwriters a substantial sum. Finally, the Underwriters admit that they knew of National's claim against them as early as 1989. Summary judgment was not entered in *Smith v. Hughes Aircraft Co.* until September 1992. During this period, the Underwriters made no effort to persuade National to join in the litigation. Thus, their self-serving claim that an earlier notice would have altered events is unconvincing.

■ The Underwriters argue that timely notice was a condition precedent to recovery under the policies. However, under California law, a condition precedent is subject both to waiver, *see Farnum v. Phenix Ins. Co.*, 83 Cal. 246, 23 P. 869 (1890); *Beasley v. Pacific Indem. Co.*, 200 Cal.App.2d 207, 208, 19 Cal. Rptr. 299, 300 (1962), and to the requirement that the insurer show prejudice. *See Ins. Co. of Pennsylvania*, 922 F.2d at 524. Moreover, the notice provisions in the two policies are not conditions precedent because they lack the requisite "clear and unambiguous expression by the parties ... that they intended the notice provision to be a condition precedent...." *Id.*, see *also Thompson v. Occidental Life Ins. Co. of California*, 9 Cal.3d 904, 912, 109 Cal.Rptr. 473, 513 P.2d 353 (1973) (intent must be expressed in "conspicuous, unambiguous and unequivocal language").

## VI.

■ The Underwriters challenge the district court's determination that they are liable for a share of National's costs in investigating and settling the claim.[17] According to the terms of the reinsurance policies, the Underwriters are obliged to pay a pro rata share of the "costs" incurred by National.[18] Costs are defined under the policies as "interest accruing after entry of judgment, investigation, adjustment and legal expenses." Both policies also include provisions requiring National to obtain the Underwriters' written consent to incur "costs" in association with any "claim or claims arising which appear likely to exceed the Primary Limit(s)."[19] The Underwriters argue that Na-

---

17. If they are liable, the Underwriters do not challenge the amount of their share of the costs.

18. LC 103204 provides in pertinent part:
 2. APPORTIONMENT OF COSTS. Costs incurred with the written consent of the Underwriters shall be apportioned as follows:—
 (a) Should any claim or claims become adjustable prior to the commencement of trial for not more than the Primary Limit(s), then no Costs shall be payable by the Underwriters.
 (b) Should, however, the amount for which the said claim or claims may be so adjustable exceed the Primary Limit(s), then the Underwriters, if they consent to the proceedings continuing, shall contribute to the Costs in the ratio that their proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss.

19. Under LC 58392 the Underwriters were not obliged to pay until National's liability under the primary policy exceeded $500,000. The most they would pay in indemnity coverage for one year under LC 58392 was $500,000. LC 103204 came into effect only when a claim under the

tional's failure to obtain this written consent precludes them from recovering a pro rata share of costs.

National first advised the Underwriters that it was incurring costs related to the Hughes claim in the May 31, 1989 letter. As noted above, the Underwriters did not respond until after this lawsuit was filed some two years later. The district court held that the Underwriters' refusal to respond to the repeated attempts by National to apprise them of the ongoing settlement negotiations estopped them from asserting as a defense National's failure to obtain written consent for incurring the costs. We agree.

 "The object of equitable estoppel is to 'prevent a person from asserting a right which has come into existence by contract, statute or other rule of law where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so.'" *Skulnick v. Roberts Express, Inc.,* 2 Cal. App.4th 884, 891, 3 Cal.Rptr.2d 597 (1992) (*quoting Brown v. Brown,* 274 Cal.App.2d 178, 188, 82 Cal.Rptr. 238 (1969)). Where an insurer does not respond to notice from the insured that it intends to settle with an adversary, the insurer may not then invoke a clause in the policy requiring the insured to obtain approval prior to settling any claims. *See, e.g. Fisher v. USAA Casualty Ins. Co.,* 973 F.2d 1103, 1107 (3d Cir.1992); *Boyle v. Erie Ins. Co.,* 441 Pa.Super. 103, 656 A.2d 941, 944 (insurer who maintained silence for ten months was not "heard to complain that the consent to settlement clause was violated by its insureds") *appeal denied,* 542 Pa. 655, 668 A.2d 1120 (1995); *State Farm Mut. Ins. Co. v. Del Pizzo,* 586 N.Y.S.2d 310, 311, 185 A.D.2d 352 (1992) (insurer's failure to respond to insured's letter informing it of settlement estopped insurer from denying coverage for failure to obtain consent); *Powers v. Calvert Fire Ins. Co.,* 216 S.C. 309, 57 S.E.2d 638, 642 (1950)("An insurer will not be permitted to ... sit down and hold its hands and purse and thereafter escape liability for fulfillment of its contract by reason of the insured's effort, after fair notice, to recoup his loss by litigation against a wrongdoer.").

primary policy exceeded $350,000 and obliged the Underwriters for a maximum of $150,000 in indemnity coverage.

## VII.

 The Underwriters also ask the court to review the magistrate judge's discovery order compelling them to turn over documents they believe are protected by the attorney-client privilege and the work product doctrine. We lack jurisdiction to do so.

When reviewing final judgments in civil proceedings, this court has jurisdiction to review any interlocutory orders that may have affected the outcome below. *Chacon v. Wood,* 36 F.3d 1459, 1467 (9th Cir.1994). Orders that could not have affected the outcome, *i.e.,* orders not material to the judgment, are not appealable. *See Akin v. PA-FEC Ltd.,* 991 F.2d 1550, 1563 (11th Cir. 1993).

Here, the Underwriters did not comply with the Magistrate Judge's discovery ruling prior to the district court entering summary judgment against them. Thus, the discovery order was not material to the district court's decision—none of the documents were considered in granting National's motion for summary judgment. We therefore lack jurisdiction to review the discovery order.

The judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.