**DIETZ INTERNATIONAL PUBLIC ADJUSTERS OF CALIFORNIA, INC., Plaintiff,**

v.

**EVANSTON INSURANCE COMPANY, Defendant.**

**Case No. CV 09–06662 MMM (Ex).**

United States District Court, C.D. California.

June 29, 2011.

John A. Belcher, Nicholas W. Song, Law Offices of John A. Belcher, Pasadena, CA, for Plaintiff.

John M. Hochhausler, Manning and Kass, Ellrod, Ramirez, Trester, Alan H. Barbanel, Stephen L. Cope, Stephen D. Treuer, Barbanel and Treuer PC, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

On September 14, 2009, Dietz International Public Adjusters of California brought this action against its insurer, Evanston Insurance Company.[1] Seeking declaratory relief and damages, Dietz asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing.[2] Evanston has moved for summary judgment on all of Dietz's claims.[3] Dietz opposes the motion.[4]

### I. FACTUAL BACKGROUND

Dietz is an independent public insurance adjuster, retained by clients who have suffered property damage covered by insurance.[5] In exchange for a fee, Dietz acts as the liaison between the client, the insurer, and contractors hired to repair the damage.[6] It negotiates a settlement with its client's insurer, holds the settlement funds, and makes payments from those funds to the contractors or the client.[7]

In April 2006, Dietz discovered that one of its employees, Jessica Estrada, was embezzling funds from the company.[8] Thereafter, Dietz was "faced with a flood of demands exceeding $2,000,000 from third parties whose checks were diverted by Jessica Estrada."[9] As a result, it "reimbursed third[-]party clients for forty[-]nine claims, in a sum exceeding $2.17 million."[10] Dietz seeks to recover the amounts paid and associated attorneys' fees under a professional liability insurance policy issued by Evanston.[11]

### A. Dietz's Professional Liability Insurance Agreement with Evanston

Evanston issued a series of three professional liability insurance policies to Dietz, which covered the period from June 23, 2005 to June 23, 2008.[12] The policies provided that Evanston would "pay on behalf of [Dietz] all sums in excess of the deductible amount stated in the Declarations which [Dietz] ... bec[a]me legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST [IT] DURING THE POLICY PERIOD ... by reason of any act, error or omission in professional services rendered or that should have been rendered by [Dietz] or by any person for whose acts, errors and omissions [it was] legally responsible, and arising out of the conduct of the profes-

1. Notice of Removal, Docket No. 1 (Sept. 14, 2009), Exh. A (Complaint).

2. First Amended Complaint ("FAC"), Docket No. 21 (January 6, 2010).

3. Motion for Summary Judgment ("Motion"), Docket No. 25 (June 26, 2010). See also Reply in Support of Motion for Summary Judgment ("Reply"), Docket No. 36 (August 6, 2010).

4. Memorandum in Opposition to Motion for Summary Judgment ("Opposition"), Docket No. 32 (July 30, 2010).

5. Defendant's Statement of Uncontroverted Facts and Conclusions of Law ("Def.'s Facts"), Docket No. 25 (June 26, 2010), ¶ 22; Plaintiff's Separate Statement of Material Facts ("Pl.'s Facts"), Docket No. 33 (July 30, 2010), ¶ 22. See also Defendant's Reply to Plaintiff's Separate Statement of Material Facts ("Def.'s Reply Facts"), Docket No. 37 (Aug. 6, 2010), ¶ 22.

6. Def.'s Facts, ¶ 22, Pl.'s Facts, ¶ 22.

7. Id.

8. Def.'s Facts, ¶ 10; Pl.'s Facts, ¶ 10.

9. Opposition at 3.

10. FAC, ¶ 20.

11. Id., ¶ 70.

12. Def.'s Facts, ¶¶ 1–3; Pl.'s Facts, ¶¶ 1–3.

sional services of [Dietz] as an insurance claim adjuster." [13]

The parties agree that the second policy, which was effective from June 23, 2006 to June 23, 2007 ("the 2006/2007 Policy") is the relevant policy, since it was in force when Dietz received the first alleged claim concerning Estrada's embezzlement.[14] The 2006/2007 Policy provides that "[t]wo or more claims arising out of a single act, error or omission, or a series of related acts, errors or omissions, shall be treated as a single claim. All such claims, whenever made, shall be considered first made on the date on which the earliest claim arising out of such acts, errors or omissions was first made, and all such claims shall be subject to the same limit of liability." [15]

The 2006/2007 policy has specific provisions that govern Dietz's ability to investigate and pay potential claims. It states:

"[Dietz] shall give full assistance and cooperation to the Company as respects all claims made against [Dietz] at [Dietz's] expense. [Dietz] shall not, except at their own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the written consent of the Company." [16]

The 2006/2007 policy also states: "As a condition precedent to the right to the protection afforded by this insurance, [Dietz] shall, as soon as practicable, give to the Company written notice ... of any claim against [it]. In the event suit is brought or arbitration is instituted against [Dietz], [it] shall immediately forward to the Company through Shand Morahan & Company, Inc., every demand, notice, summons or other process received directly or by [its] representatives." [17]

## B. Estrada's Embezzlement and Dietz's Affected Clients

Sometime prior to April 2006, Estrada began "forging endorsements on insurance drafts and ceased timely paying clients the balance of monies Dietz owed them once the clients' insurance claims were settled. Instead, Estrada began diverting both clients' monies and Dietz's monies to herself through a variety of schemes and artifices." [18] Estrada allegedly concealed her embezzlement "by constantly moving money between Dietz's accounts, creating forged statements, creating forged endorsements, making excessive wire transfers, writing excessive numbers of checks and improperly accessing Dietz's line of credit." [19] Dietz contends that Estrada "altered books and otherwise made misrepresentations to clients on the status of claims payment and timing of payment." [20]

---

13. Def.'s Facts, ¶ 5; Pl.'s Facts, ¶ 5.

14. Def.'s Facts, ¶ 9; Pl.'s Facts, ¶ 9; Motion at 2; Opposition at 1. See also Declaration of Glenn Fischer in Support of Motion for Summary Judgement ("Fischer Decl."), Docket No. 25 (June 26, 2010), Exh. B (2006/2007 Policy). Defendant contends that the relevant policy language is substantially the same in all three policies. (Motion at n. 1). Thus, it is immaterial that Evanston's person most knowledgeable, Glenn Fischer, could not recall whether, in denying coverage, "[he] made a determination whether any claimed act fell within any particular policy period." (Declaration of John A. Belcher in Opposition to Motion for Summary Judgment, Docket No. 35 (July 30, 2010), Exh. S (Fischer Depo.) at 18:5–7.)

15. Def.'s Facts, ¶ 6; Pl.'s Facts, ¶ 6.

16. Def.'s Facts, ¶¶ 1–3; Pl.'s Facts, ¶¶ 1–3; Fischer Decl., Exh. B (2006/2007 Policy, Assistance and Cooperation of the Insured) at 41.

17. Def.'s Facts, ¶ 7; Pl.'s Facts, ¶ 7.

18. Def.'s Facts, ¶ 11; Pl.'s Facts, ¶ 11.

19. Def.'s Facts, ¶ 12; Pl.'s Facts, ¶ 12.

20. Def.'s Facts, ¶ 13; Pl.'s Facts, ¶ 13.

After discovering Estrada's acts in April 2006, Dietz investigated and reported the matter to the police.[21] Estrada was arrested on August 26, 2006 and subsequently pled *nolo contendere* to a charge of grand theft.[22] On November 26, 2006, Donald Lettiere, Dietz's President, signed a "Statement of Loss" for the Los Angeles County Probation Department in support of a request for an order for restitution against Estrada.[23] Lettiere asserted that Dietz had suffered losses of $2,068,151.93–$1,664,783 that Dietz had paid to clients as of November 30, 2006, and $403,368.93 that it owed but had not yet paid.[24] Although Estrada was ordered to pay restitution of $2,068,151.93,[25] Dietz "got very little money" from her.[26]

Dietz contends that, faced with a "flood" of client claims due to Estrada's criminal acts, its "very survival ... as a company depended on promptly scrambling to address each of the claims."[27] Between March 14, 2006 and August 25, 2008, Dietz independently resolved forty-nine client claims allegedly resulting from Estrada's acts by making direct payments to the clients.[28] The majority of the claims did not proceed to litigation, but were resolved by Dietz following complaints by clients or contractors that were not timely paid due to the diversion of settlement funds.[29] Some claims, however, involved litigation or threats of suit.[30] Dietz did not advise Evanston of the settlements prior to making payments to resolve them. Nor did Evanston ever consent to the settlement of any of these claims or to any of the payments made.[31]

## C. The Medina Litigation

Evanston did become involved in one claim against Dietz arising out of Estrada's embezzlement.[32] After Yolonda Medi-

21. Def.'s Facts, ¶ 14; Pl.'s Facts, ¶ 14.

22. Def.'s Facts, ¶¶ 18–19; Pl.'s Facts, ¶¶ 18–19.

23. Def.'s Facts, ¶ 20; Pl.'s Facts, ¶ 20.

24. *Id.* These amounts represent the majority of the claims for which Dietz seeks recovery in this action. The total is far greater than the amount actually converted by Estrada, purportedly because Dietz's clients sought "consequential damages and other damages arising from the delay in payments." (FAC, ¶¶ 14–15.)

25. Def.'s Facts, ¶ 21; Pl.'s Facts, ¶ 21.

26. Declaration of Stephen L. Cope in Support of Motion for Summary Judgment ("Cope Decl."), Docket No. 25 (June 26, 2010), Exh. 3 (Lettiere Deposition) at 36:17–18. Dietz apparently asserted claims against Estrada's CPA, but was unable to obtain relief because the accountant declared bankruptcy. *Id.* at 36:18–19.

27. Opposition at 4.

28. Def.'s Facts, ¶¶ 23–24, 71–119; Pl.'s Facts, ¶¶ 23–24, 71–119. This number does not include the Medina litigation, which is discussed *infra*.

29. As an example, "Miguel Ramirez and Wells Fargo Bank made a claim against Dietz because insur[ance] proceeds for a building were not timely paid." (FAC, ¶ 29). Dietz settled this claim on July 14, 2006 by paying $46,102. (*Id.*; Def.'s Facts, ¶ 79; Pl.'s Facts, ¶ 79).

30. As an example, George Killinger sued Dietz on September 15, 2006. (Def.'s Facts, ¶ 94; Pl.'s Facts, ¶ 94). In December 2006, Dietz entered into a settlement agreement with Killinger that included a stipulated judgment against Dietz for $54,000. (FAC, ¶ 19; Def.'s Facts, ¶ 95; Pl.'s Facts, ¶ 95). Dietz paid Killinger on September 28, 2007. (Def.'s Facts, ¶ 96; Pl.'s Facts, ¶ 96).

31. Def.'s Facts, ¶ 120, Pl.'s Facts, ¶ 120. While Dietz disputes that the payments were voluntary, it adduces no evidence that Evanston authorized any of the settlements or payments, or that Dietz ever sought Evanston's authorization prior to entering into the settlements or making the payments. (*Id.*)

32. Def.'s Facts, ¶¶ 25–39; Pl.'s Facts, ¶¶ 25–39. The parties' primary dispute concerns Evanston's awareness of other potential claims due to its involvement in the Medina litigation.

na's home was damaged in a fire on October 10, 2005, she engaged Dietz to act as her adjuster.[33] Dietz negotiated a settlement with Medina's insurer for $128,570.64; this amount was placed in a Dietz trust account.[34] After Estrada apparently diverted the funds, Medina's mortgage company sued Dietz on May 2, 2007. Medina filed a second suit on October 9, 2007.[35] The two actions were later consolidated.[36]

Evanston first received notice of the mortgage company's and Medina's claims on October 18, 2007.[37] This was the first notice Evanston received regarding any claim arising out of Estrada's acts.[38] Evanston acknowledged the tender and agreed to defend Dietz in the Medina litigation under a reservation of rights on November 24, 2007.[39] The Medina litigation was eventually resolved at a mandatory settlement conference on May 30, 2008.[40] As part of the settlement, Dietz waived any fee Medina owed, and Evanston paid plaintiffs $135,000 on Dietz's behalf.[41]

Evanston agreed to provide independent defense counsel for Dietz in the Medina litigation; citing California Civil Code § 2860, however, it advised Dietz on November 24, 2007 that it would pay independent counsel $185 per hour and require that counsel comply with its billing guidelines.[42] On November 16, 2007, Leonard Sands of Sands & Associates asked to be appointed Dietz's independent counsel in the Medina action, but reserved his right to dispute the $185 an hour billing limit.[43] On December 11, 2007, Evanston appointed Sands & Associates as independent counsel for Dietz, and notified Dietz that it was also appointing Todd Croutch of Fraser & Fonda to represent Dietz. Dietz contends that Croutch acted on Evanston's behalf.[44]

Although it reserved the right to dispute the billing limit imposed by Evanston, Sands & Associates submitted bills to Evanston at the $185 rate.[45] The firm billed Evanston a total of $46,024.55 in fees.[46] Evanston applied the policy's $5,000 deductible against these expenses,[47] and ulti-

**33.** Def.'s Facts, ¶¶ 25–26; Pl.'s Facts, ¶¶ 25–26.

**34.** Def.'s Facts, ¶ 27; Pl.'s Facts, ¶ 27.

**35.** Def.'s Facts, ¶¶ 29–31; Pl.'s Facts, ¶¶ 29–31.

**36.** Def.'s Facts, ¶ 32; Pl.'s Facts, ¶ 32.

**37.** Def.'s Facts, ¶ 36; Pl.'s Facts, ¶ 36. Although Dietz contends that the notice it sent Evanston was not limited solely to the Medina litigation, there is no evidence that Evanston received prior notice of any claim. (*Id.*)

**38.** Def.'s Facts, ¶ 37; Pl.'s Facts, ¶ 37.

**39.** Def.'s Facts, ¶¶ 38–39; Pl.'s Facts, ¶¶ 38–39. Dietz does not dispute that Evanston agreed to provide a defense; it contends, however, that its attorneys' fees were not fully paid. (*Id.*)

**40.** Def.'s Facts, ¶ 43; Pl.'s Facts, ¶ 43.

**41.** Def.'s Facts, ¶ 44; Pl.'s Facts, ¶ 44.

**42.** Def.'s Facts, ¶ 40; Pl.'s Facts, ¶ 40. While Dietz disputes Evanston's " 'right' to withhold [fees incurred above the $185 per hour level,]" it does not dispute that Evanston's letter stated it would pay fees at this rate and required that counsel comply with its billing guidelines. (*Id.*)

**43.** Def.'s Facts, ¶ 41; Pl.'s Facts, ¶ 41.

**44.** Def.'s Facts, ¶ 42; Pl.'s Facts, ¶ 42.

**45.** Def.'s Facts, ¶ 46; Pl.'s Facts, ¶ 46.

**46.** Def.'s Facts, ¶ 47; Pl.'s Facts, ¶ 47. As noted, Sands reserved the right to dispute the billing rate.

**47.** Def.'s Facts, ¶ 48; Pl.'s Facts, ¶ 48. Dietz disputes whether the deductible was correctly applied, arguing that expended far more than the $5,000 deductible on investigation and defense costs. (*Id.*)

mately paid Sands & Associates $25,288.15 for its work on the Medina litigation.[48] It declined to pay certain categories of fees:[49] (1) fees and costs incurred prior to the date Evanston received notice of the Medina lawsuit on October 18, 2007; (2) its write-off of a portion of time entries billed in quarter-hour increments;[50] (3) time devoted to insurance coverage issues; (4) time spent on administrative matters; (5) travel time; (6) duplicative time entries; (7) costs for which no invoices were provided; (8) costs categorized as overhead; and (9) large copy jobs for which no explanation was provided. Dietz disputes that Evanston properly declined to pay these amounts.[51]

After Evanston advised Sands of its final determination regarding fees, Sands continued to send past due notices to Evanston, reflecting more than $10,000 in unpaid fees and costs.[52] In May 2009, Glenn Fischer of Evanston called Heleni Suydam of the Sands firm to ask about the invoices. He requested that she advise whether Sands maintained that Evanston owed it money for its work on the Medina lawsuit and asked that, if it did, she forward backup information to support the request for payment.[53] The Sands firm did not reply, and on June 6, 2009, Fischer emailed Suydam, reiterating his request for clarification and noting that if he re-ceived no response, he would assume Sands conceded it had been fully paid.[54] While Dietz contends that the invoices the Sands firm sent reflecting past due amounts demonstrate that there was a dispute regarding what was owed, no one from Sands ever directly responded to Fischer's requests for information.[55]

### D. Dietz's Tender of the Non–Medina Settlement Claims to Evanston

On June 17, 2009, Dietz's counsel tendered to Evanston, "[o]n behalf of Dietz, . . . a demand for claims arising from the fraudulent diversions of funds by Jessica Estrada."[56] On July 7, 2009, counsel sent Evanston copies of checks Dietz had written to thirty-six entities in settlement of claims related to Estrada's acts.[57] Dietz had not notified Evanston of the settlements or payments prior to July 7, 2009.

After reviewing the materials submitted and discussing Dietz's tender with its attorney, Evanston denied coverage for the claims on July 31, 2009.[58] Its lawyer wrote:

"The Policy is a professional liability policy designed to protect Dietz from claims made against Dietz by others for professional negligence. In contrast Dietz's tender seeks reimbursement on its own behalf for the amounts embezzled by Estrada, which is not a claim against Dietz for professional negligence. Therefore, the Policy does not provide coverage."[59]

48. Def.'s Facts, ¶ 51; Pl.'s Facts, ¶ 51.

49. Def.'s Facts, ¶ 49; Pl.'s Facts, ¶ 49.

50. Evanston appears to have reduced these entries to .10 of an hour. (See Declaration of John M. Hochhausler in Support of Motion for Summary Judgment ("Hochhausler Decl."), Docket No. 25 (June 26, 2010), Exh. F (July 31, 2008 Letter to Sands & Associates) at 78.)

51. Id.

52. Def.'s Facts, ¶ 52; Pl.'s Facts, ¶ 52.

53. Def.'s Facts, ¶ 53; Pl.'s Facts, ¶ 53.

54. Def.'s Facts, ¶ 54; Pl.'s Facts, ¶ 54.

55. Def.'s Facts, ¶ 55; Pl.'s Facts, ¶ 55.

56. Def.'s Facts, ¶ 56; Pl.'s Facts, ¶ 56. Dietz disputes that this was the first tender of these claims. (Id.)

57. Def.'s Facts, ¶ 57; Pl.'s Facts, ¶ 57.

58. Def.'s Facts, ¶ 59; Pl.'s Facts, ¶ 59.

59. Hochhausler Decl., Exh. I (July 31, 2009 Letter) at 4.

The letter noted that "Evanston specifically reserve[d] all rights, including the right to assert and rely upon additional coverage defenses as they may be discovered or ascertained." [60]

Questioned at deposition on May 20, 2010 as to why coverage had been denied, Evanston's person most knowledgeable, Glenn Fischer, responded: "To the best of my knowledge the basis for the denial is that basis stated [ ]in our coverage correspondence to you." [61] When pressed for an additional response, Fischer stated that "[i]t appeared that the tender was seeking more of a first party fidelity coverage than third party professional errors and omissions coverage, which was the type of policies we issued to Dietz." [62] Fischer was later asked if there were any other grounds for denial to which he had not testified; he stated that "[t]here [might] be others that exist as [the July 31, 2009] letter says, but [that those to which he had testified were] the ones that [he was] aware of. . . ." [63]

While Dietz did not formally tender the non-Medina claims until June 17, 2009, it argues that during the course of the Medina litigation, Evanston became aware that other claims related to Estrada's embezzlement had been made. At his deposition, Fischer was asked if he knew at the time of the Medina settlement conference "that there were thefts by Estrada that did not involve Medina," [64] and responded that he "believe[d] that was one of the allegations." [65]

As respects claims other than Medina's, Dietz President Donald Lettiere testified:

"Q. [W]hen did you first tell Evanston about [the other claims made against Dietz]?

A. Mr. Croutch [the attorney appointed by Evanston to work with the Sands firm on the Medina litigation]—when we met in Medina and we resolved it, I said 'I have other claims.' He said it would all be taken as one. I said, 'On property damage it reinstates itself.' He said, 'We're going to consider it all one, and that's the end of it.'

\* \* \*

Q. So when the Medina claim was settled, that's when you told Mr. Croutch about other matters?

A. 'I have other claims.' He said they were going to handle them as one—one claim. I said, 'That's crazy. Property reinstates itself for each claim,' and that was it.

Q. Did you mention Kurzen?

A. I said 'other claims.'

Q. You didn't mention anybody specifically to Mr. Croutch?

A. No, because I had so many of them. They were still coming in." [66]

---

**60.** *Id.*

**61.** Belcher Decl., Exh. S (Fischer Depo.) at 74:11–13.

**62.** *Id.* at 75:15–18. Plaintiff's counsel asked Fischer to "identify the basis for the coverage denial to the best of your ability as the PMK." *Id.* at 74:8–10. Fischer's responses focused on the basis communicated in the July 31 denial letter, specifically that Dietz appeared to seek "first part fidelity coverage" not provided by the policy. *Id.* at 75:15–18.

**63.** *Id.* at 113:11–17. There is no indication that plaintiff propounded other discovery that asked Evanston to identify all policy provisions upon which it relied in defending this action.

**64.** *Id.* at 56:16–19.

**65.** *Id.*

**66.** Cope Decl., Exh. 3 (Lettiere Deposition) at 30:2–33:2. Kurzen was a claim by Reinhardt Kurzen that Dietz independently resolved by final payment on July 25, 2007. (Def.'s Facts, ¶ 71; Pl.'s Facts, ¶ 71.)

Lettiere stated that this discussion occurred following the mandatory settlement conference in Medina on May 30, 2008, and that this was the first time he had notified anyone representing Evanston of other potential claims:

"Q. And the first time you mentioned that ['I have other claims'] is when you found out Medina settled; is that right?

A. Yes. They came out, and they talked to me in the lobby." [67]

Lettiere explained that Dietz did not notify Evanston earlier of the non-Medina claims because he did not originally think to seek coverage for the claims under Evanston's policy:

"Q. With respect to this list of 48 [claims], did you ever send Evanston any communications[,] written communications, advising them of these claims?

A. No.

Q. Okay. Why not?

A. First of all, I was busy paying them off. I had no real thoughts about whether there was even coverage for me under this.

Q. Why? Why not?

$*$ $*$ $*$

A. Because we had gone after Jessica, got very little money, went after her CPA who declared bankruptcy, and I was very down because we had—I had expended all my savings, my 401[k], borrowed a million dollars, and it never entered into my mind to pursue it until Mr. Belcher and I met and he realized that that was our last venue to go through.

Q. What do you mean by your last venue to go through?

A. There was no one else to go after. Jessica had no money, and the bookkeeper-CPA was bankrupt." [68]

None of the payments Dietz made to resolve the forty-nine non-Medina claims was made after July 7, 2009, when plaintiff's counsel first identified the claims for Evanston.[69] Only three of the payments were allegedly made after Dietz tendered the Medina litigation to Evanston on October 18, 2007.[70] Of these, only one was allegedly made after Lettiere notified Croutch of "other claims" at the Medina settlement conference on May 30, 2008.[71] Dietz did not ask Evanston to consent to

**67.** Cope Decl., Exh. 3 (Lettiere Deposition) at 157:2–5. Lettiere also acknowledged: "We didn't notify Evanston, I guess, other than at the time of the Medina thing, [during] which I indicated we had various claims still outstanding." (*Id.* at 55:16–18.)

**68.** *Id.* at 36:6–37:5.

**69.** Def.'s Facts, ¶ 24; Pl.'s Facts, ¶ 24. Dietz alleges that the last relevant payment was made August 25, 2008. (*Id.*)

**70.** *Id.* Dietz asserts that the last three payments for which it seeks reimbursement were: (1) a payment to Joey Castillo on January 22, 2008; (2) a payment to Joey Castillo on April 24, 2008, and (3) a payment to "Bobby Azinian DBA Fuddrucker's" on August 25, 2008. (Pl.'s Facts, ¶ 24).

**71.** *Id.* This is the payment to "Bobby Azinian DBA Fuddrucker's" on August 25, 2008. (Pl.'s Facts, ¶ 24). Evanston contends that Dietz has failed to adduce evidence that it made a payment to Azinian on August 25, 2008. (Def.'s Reply Facts, ¶ 24). It cites the fact that in its response to Evanston's statement of uncontroverted facts, Dietz does not dispute that it "had fully resolved all of its obligations to Robert Azinian by November 30, 2006." (Def.'s Facts, ¶ 110; Pl.'s Facts, ¶ 110). Evanston also notes that the check Dietz proffers to demonstrate that it made a payment to Azinian in August 2008 was made payable to "Johnny Rockets," not Azinian or Fuddruckers. (Pl.'s Additional Facts, ¶ 8; Def.'s Reply to Additional Facts, ¶ 8).

any of the settlement payments, and Evanston did not consent.[72]

### E. Dietz's Claims in this Action

Dietz filed this action against Evanston on September 14, 2009, seeking full reimbursement for the payments it made to settle the forty-nine non-Medina claims arising from Estrada's embezzlement. Dietz also seeks full indemnification for its expenses in the Medina action; this prayer apparently includes Sands & Associates' unpaid fees, and the fee Medina owed Dietz that it forfeited as part of the settlement. Finally, Dietz seeks to recover fees incurred "to investigate and adjust claims not related to the Medina claim." [73]

When Evanston answered Dietz's complaint, it asserted, as its second affirmative defense, that coverage was barred by the terms of the policy.[74] Specifically, Evanston alleged that "[a]ny claimed obligation under the policy of insurance at issue in the Complaint [is] barred, in whole or in part, by the terms, conditions, limitations, provisions, definitions and exclusions of the policy." [75] Evanston's answer did not identify any particular policy provision(s) that precluded coverage. At his deposition, Evanston's PMK Fischer discussed only the basis on which Evanston initially denied coverage for the non-Medina claims.[76] When asked about other potential grounds for denying coverage, he replied that there could be other grounds and referenced the language of the July 31, 2009 letter reserving Evanston's rights to assert other bases for the denial.[77] There is no evidence suggesting that Dietz propounded discovery to tie down specifically the policy provisions on which Evanston intended to rely.

## II. DISCUSSION

### A. Legal Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

---

72. Def.'s Facts, ¶ 110; Pl.'s Facts, ¶ 110. Although Dietz contends the payments were not voluntary, it adduces no evidence that it sought Evanston's consent to make the payments or that Evanston granted consent. (*Id.*)

73. Opposition at 9.

74. Answer, Docket No. 22 (January 26, 2010), ¶ 24.

75. *Id.*

76. Belcher Decl., Exh. S (Fischer Depo.) at 74:11–75:18.

77. *Id.* at 113:11–17.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed. R. Civ. Proc. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electric Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. Fed. R. Civ. Proc. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson v. Pima Community College,* 83 F.3d 1075, 1081–82 (9th Cir.1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

### B. Whether Evanston Waived Its Right to Assert That There is No Coverage Under the No–Voluntary Payments Clause

In arguing that it is not required to cover the non-Medina claims, Evanston relies primarily on the no-voluntary payments clause in the 2006/2007 Policy. As noted, this provision states that Dietz "shall not, except at [its] own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the written consent of the Company." [78] Dietz contends that Evanston waived this basis for denying coverage by not "articulating ... the voluntary payments provision in any reservation of rights or denial of coverage letters." [79] It also asserts that "[a]t no time prior to the filing of this motion did Evanston ever advance the voluntary payment clause as a defense." [80]

 " '[W]aiver is the intentional relinquishment of a known right after knowledge of the facts.' " *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 31–32, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (quoting *City of Ukiah v. Fones,* 64 Cal.2d 104, 107–08, 48 Cal.Rptr. 865, 410 P.2d 369 (1966)); *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.,* 30 Cal.App.4th 54, 60, 35 Cal.Rptr.2d 515 (1994) ("Waiver always rests upon intent"); see also *National Union Fire Ins. Co. v. Siliconix Inc.,* 726 F.Supp. 264, 270 (N.D.Cal.1989) (applying California law, and finding no waiver in the absence of evidence that an insurer intentionally relinquished its right to contest coverage). California courts will also find waiver where "the insurer's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Waller,* 11 Cal.4th at 33–34, 44 Cal.Rptr.2d 370, 900 P.2d 619 (citing *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1559 (9th Cir.1991) ("California courts will find waiver when a party intentionally relinquishes a right, or when that party's acts are so inconsistent with an intent to

---

**78.** Def.'s Facts, ¶¶ 1–3; Pl.'s Facts, ¶¶ 1–3; Fischer Decl., Exh. B (2006/2007 Policy) at 41.

**79.** Opposition at 19. Dietz also references Evanston's failure to raise "late notice" as an issue. Evanston, however, "does not rely on Dietz's late notice as a basis for summary judgment." (Motion at 24). For this reason, Dietz's reliance on *National Am. Ins. Co. v.* *Certain Underwriters at Lloyd's London,* 93 F.3d 529, 538 (9th Cir.1996), in its discussion of waiver is misplaced. See *id.* ("Under California law, a reinsurer may invoke the defense of late notice so long as it immediately objects to the late notice, and suffers 'actual and substantial prejudice' ").

**80.** Opposition at 9.

enforce the right as to induce a reasonable belief that such right has been relinquished")). See also *Intel*, 952 F.2d at 1559 ("In cases where waiver has been found, there is generally some element of misconduct by the insurer or detrimental reliance by the insured"). The burden "is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation[;] . . . doubtful cases will be decided against a waiver." *Waller*, 11 Cal.4th at 31, 44 Cal.Rptr.2d 370, 900 P.2d 619 (internal quotes omitted).

■ Dietz cites California Insurance Code § 554 in support of its assertion that Evanston waived its right to rely on the no-voluntary payments clause as a basis for denying coverage by failing to raise the issue prior to filing the present motion.[81] See CAL. INS.CODE § 554 ("Delay in the presentation to an insurer of notice or proof of loss is waived, if caused by an act of his, or if he omits to make objection promptly and specifically upon that ground"). The waiver provision outlined in § 554, however, does not apply to coverage denials based on a no-voluntary payments provision. See *Insua v. Scottsdale Ins. Co.*, 104 Cal.App.4th 737, 742–44, 129 Cal.Rptr.2d 138 (2002) (holding that California Insurance Code § 554 did not apply to a no-voluntary payments provision and

that an insurer had not waived its right to deny coverage on the basis of the no-voluntary payments provision despite the fact that it had not cited the defense in its initial denial letter).[82]

■ Dietz has adduced no evidence that Evanston affirmatively waived its right to rely on the no-voluntary payments provision or that its conduct was inconsistent with an intent to enforce the provision. Indeed, the evidence suggests the opposite. In its July 31, 2009 denial letter, Evanston "specifically reserve[d] all rights, including the right to assert and rely upon additional coverage defenses as they may be discovered or ascertained."[83] When it answered Dietz's complaint, moreover, Evanston asserted as an affirmative defense the fact that Dietz's claims were barred "by the terms, conditions, limitations, provisions, definitions and exclusions of the policy."[84] Similarly, Evanston's PMK testified that there could be grounds for denying coverage other than those identified in the July 31 letter.[85] Although Evanston did not cite the no-voluntary payments provision in its July 31 coverage letter, its failure to identify this potential basis for denying coverage cannot be construed as a waiver of the claim in this litigation. See *Waller*, 11 Cal.4th at 31–33, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("California courts have applied the general rule that waiver re-

**81.** *Id.* at 5–6.

**82.** As the *Insua* court noted, Insurance Code § 554 is designed to protect the insured against conduct by the insurer that "mislead[s] the insured into inaction." *Insua*, 104 Cal.App.4th at 743, 129 Cal.Rptr.2d 138. This problem "does not arise in the context of a no-voluntary-payments provision. Such provision typically bars 'reimbursement for pre-tender expenses based on the reasoning that until the defense is tendered . . . there is no duty to defend. . . .' Under the provision, only 'previous voluntary payments by the insured are barred from indemnification.' Once the insured has requested and been

denied a defense by the insurer, 'the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent. . . .' However, if the insured makes no demand to defend, the no-voluntary provision lawfully precludes recovery of pre-tender costs." *Id.* (internal citations omitted).

**83.** Hochhausler Decl, Exh. I.

**84.** Answer, ¶ 24.

**85.** Belcher Decl., Exh. S (Fischer Depo.) at 113:11–17.

quires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial.... A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed. Such a conclusion would contradict the holdings of the majority of California and sister-state cases addressing the waiver issue"). This is particularly true since Evanston broadly invoked all provisions of the policy as the basis for its affirmative defense when it answered Dietz's complaint.

■ Dietz has adduced no evidence that it detrimentally relied on the fact that it believed the no-voluntary payments provision had been waived or that it was prejudiced by Evanston's delay in identifying the defense.[86] Thus, even were the court to find that Evanston did not assert an affirmative defense based on this policy provision—which it does not—the court could not find that Evanston waived the no-voluntary payments provision as a basis for seeking summary judgment.[87] See *Norwood v. Vance,* 591 F.3d 1062, 1075 (9th Cir.2010) (" '[D]efendants may raise an affirmative defense for the first time in a motion for summary judgment ... if the delay does not prejudice the plaintiff,' " quoting *Magana v. Commonwealth of N.*

*Mariana Islands,* 107 F.3d 1436, 1446 (9th Cir.1997) (noting that the Ninth Circuit has "liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings")). For all of these reasons, the court concludes that Evanston did not waive the no-voluntary payments provision as a policy defense or as a basis for seeking summary judgment.

## C. Whether the 2006/2007 Policy Provides Coverage for Dietz's Claims

Evanston argues that Dietz cannot seek recovery for payments made to resolve the forty-nine non-Medina claims or for attorneys' fees associated with investigating Estrada's embezzlement because the policy does not cover voluntary payments that are not authorized by Evanston.[88] Evanston also contends that it fully indemnified Dietz in connection with the Medina litigation.[89]

### 1. Legal Standard Governing Interpretation of Insurance Contracts

■ "Insurance policy interpretation is a question of California law, which requires courts to initially look to the insurance policy language in order to ascertain its plain meaning." *United National Ins. Co. v. Spectrum Worldwide, Inc.,* 555 F.3d 772, 776 (9th Cir.2009) (citing CAL. CIV. CODE § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is

---

**86.** Dietz's failure to show that it detrimentally relied on the fact that the no-voluntary payments provision had been waived as a policy defense forecloses any argument that Evanston should be estopped from raising the provision as a defense. See *Waller,* 11 Cal.4th at 33–34, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("[E]stoppel requires a showing of detrimental reliance by the injured party").

**87.** At the hearing, Dietz's counsel asserted that Evanston waived its no-voluntary pay-

ments defense because its delay was not reasonable under § 554. As noted, however, courts have clearly held that § 554 does not apply to the no-voluntary payments provision. See *Insua,* 104 Cal.App.4th at 743, 129 Cal. Rptr.2d 138.

**88.** Motion at 10–18.

**89.** *Id.* at 19–20.

ascertainable and lawful")). As stated in Civil Code § 1636, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." In evaluating the language of an agreement, the various provisions should be examined "together, so as to give effect to every part, if reasonably practicable." CAL. CIV.CODE § 1641. "If a written policy provision is 'clear and explicit,' it must be given proper effect." *Spectrum Worldwide, Inc.*, 555 F.3d at 777 (citing *Fireman's Fund Ins. Co. v. Superior Court*, 65 Cal.App.4th 1205, 1211, 78 Cal.Rptr.2d 418 (1997)).

 If a policy provision is capable of two or more reasonable constructions, however, it is "ambiguous." *Waller*, 11 Cal.4th at 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable," citing *Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993)). "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). If a court determines that two or more interpretations of a policy term are reasonable, it "must resolve the ambiguity in favor of the insured, consistent with the insured's reasonable expectations." *E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal.4th 465, 473, 9 Cal.Rptr.3d 701, 84 P.3d 385 (2004) (citation omitted); see

also *B & E Convalescent Ctr. v. State Comp. Ins. Fund*, 8 Cal.App.4th 78, 99–100, 9 Cal.Rptr.2d 894 (1992) ("If the coverage provisions in any policy of insurance are unclear or the exclusions are ambiguous, so that a reasonable purchaser of the policy would not realize that the risk is excluded and thus would reasonably expect the insurer to furnish a defense, a defense is required"). "[L]anguage in a contract must be interpreted as a whole, [however,] and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. Courts will not strain to create an ambiguity where none exists." *Waller*, 11 Cal.4th at 18–19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (internal citations omitted).

**2. Whether Coverage for the Forty–Nine Non–Medina Claims and Expenses Incurred Investigating Estrada's Embezzlement Is Barred by the No–Voluntary Payments Clause**

As noted, the 2006/2007 Policy states that Dietz "shall not, except at [its] own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the written consent of [Evanston]."[90] In California, this type of consent requirement (commonly referred to as a "voluntary payment" or "no-voluntary payment" clause) "typically prohibit[s] the insured from voluntarily making payments, assuming obligations, or incurring expenses without the insurer's consent." B. Witkin, SUMMARY OF CALIFORNIA LAW, INSURANCE, § 320 (citing *Jamestown Builders, Inc. v. General Star Indem. Co.*, 77 Cal.App.4th 341, 346–47, 91 Cal.Rptr.2d 514 (1999) (affirming the denial of coverage for a payment made prior to tender where the policy included a no-voluntary payments clause stating that "[s]hould any claim or suit to which this

**90.** Def.'s Facts, ¶¶ 1–3; Pl.'s Facts, ¶¶ 1–3; Fischer Decl., Exh. B (2006/2007 Policy) at 41.

policy applies appear likely to exceed the Retained Limit, no loss expenses or legal expenses shall be incurred on behalf of the company without its prior consent").

▮▮▮▮ "The general validity of no-voluntary-payment provisions in liability insurance policies is well established." *Insua*, 104 Cal.App.4th at 742, 129 Cal. Rptr.2d 138 (citing *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.*, 3 Cal.3d 434, 449, 91 Cal.Rptr. 6, 476 P.2d 406 (1970) (observing that such clauses are common "to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims")). See also *Faust v. Travelers*, 55 F.3d 471, 472 (9th Cir.1995) (affirming the denial of coverage for defense costs incurred prior to tender under a no-voluntary payments clause because, "[a]s this court has previously noted, California courts have consistently honored voluntary payment provisions such as the one in the subject policy in this case," citing *Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir.1992)); *Raisin Bargaining Ass'n v. Hartford Cas. Ins. Co.*, 715 F.Supp.2d 1079, 1086 (E.D.Cal.2010) ("Unless the complaint alleges facts sufficient to support a reasonable inference that Defendant consented to Plaintiffs' payments to its private counsel, Plaintiffs cannot state a claim for breach of contract").

" 'California law enforces ... no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances. They are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim. That means insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability.... [T]he decision to pay any remediation costs outside the civil action context raises a "judgment call left solely to the insurer...." In short, the provision protects against coverage by fait accompli.' " *Low v. Golden Eagle Ins. Co.*, 110 Cal.App.4th 1532, 1546, 2 Cal.Rptr.3d 761 (2003) (quoting *Jamestown Builders, Inc.*, 77 Cal.App.4th at 346, 91 Cal.Rptr.2d 514 (internal citations omitted)).

▮▮▮ Indeed, a no-voluntary payments clause is enforceable even after an insured has tendered a claim. See *id.* In *Low*, a party independently settled claims after tendering the matter to its insurer but before coverage had been denied. The court held that the no-voluntary payments provision in the policy eliminated any duty on the part of the insurer to cover the settlement. *Id.* (noting that normally no-voluntary payment provisions are invoked to deny coverage of claims settled pretender, but that the same rule applied in "the rare case where the insured tenders the defense and then negotiates a settlement on its own, leaving the insurer in the dark," citing *Gribaldo*, 3 Cal.3d at 449, 91 Cal.Rptr. 6, 476 P.2d 406 ("[I]t is only when the insured has requested and been denied a defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent and under the compulsion of that refusal undertake his own defense at the insurer's expense")). See also *Crowley Mar. Corp. v. Fed. Ins. Co.*, No. C 08–00830 SI, 2008 WL 5071118, *8 (N.D.Cal. Dec. 1, 2008) ("An insurer is not required to pay for a settlement by the insured that is made without the insurer's knowledge or consent," citing *Low*, 110 Cal.App.4th at 1546, 2 Cal.Rptr.3d 761).

▮▮▮ It is undisputed that all of the sums Dietz seeks to recover for settling

the non-Medina claims were paid without Evanston's knowledge or authorization and prior to the time Evanston first denied coverage for the non-Medina claims on July 31, 2009. Despite the fact that it settled and paid the non-Medina claims long before it identified them for Evanston, Dietz argues that the claims relate back to its original tender of the Medina action. Specifically, it asserts that the policy treats all "related claims" as a "single claim." [91] Assuming *arguendo* that this is true and that the date of tender for all claims was October 18, 2007—the date the Medina claim was tendered—Dietz did not advise Evanston of the settlement payments or obtain its consent to make them. Evanston, moreover, did not deny coverage for the non-Medina claims until July 31, 2009—long after the payments had been made.[92] Under *Low*, therefore, recovery of the settlement payments is barred by the policy's no-voluntary payments provision. See *Low*, 110 Cal. App.4th at 1546, 2 Cal.Rptr.3d 761. (post-tender settlement payments See also *Crowley Maritime Corp.*, 2008 WL 5071118 at *8).

At oral argument, Dietz's lawyer argued that Dietz had incurred "defense fees" related to the non-Medina claims after the Medina claim had been tendered. He asserted that an insurer cannot avoid its obligation to reimburse attorneys' fees incurred following tender of a claim but before denial of coverage under a no-voluntary payments provision. Dietz, however, has adduced no evidence of the attorneys' fees it incurred in connection with non-Medina claims after tender of the Medina action. The costs it has identified related to the forty-nine non-Medina claims are direct settlement payments, not attorneys' fees incurred defending the claims.[93] Indeed, only three of the settlements were made after tender of the Medina claim; there is no evidence that "defense fees" beyond the settlement payments were incurred.[94]

91. Opposition at 16–18. Dietz relies on a policy provision stating: "Two or more claims arising out of a single act, error or omission or series of related acts, errors or omissions shall be treated as a single claim." (*Id.* at 18). Dietz argues that this language, together with its "cooperation in providing all information about all of the thefts to the carrier ... reasonably would lead an insured to believe that no further tender was necessary, since the multitude of claims was being handled as 'one claim.'" (*Id.* at 6).

92. As noted, Dietz did not advise Evanston of the fact that it had non-Medina claims until May 30, 2008. Dietz asserts that the attorney retained by Evanston to defend it in the Medina litigation knew that Dietz had other claims before this date. Liettiere cites Croutch's February 1, 2008 status report to David Vanalek of Evanston, in which, *inter alia*, he states that as part of his investigation of the Medina claim he would like to obtain information regarding "any theft of any kind by Estrada," law enforcement reports, and evidence of the criminal charges against and conviction of Estrada. (Lettiere Decl., Exh. L; see Pl.'s Facts, ¶ 25.) While Croutch's status report suggests he knew that other Dietz clients had suffered losses as a result of Estrada's embezzlement, the letter does not in any way reflect that Croutch understood Dietz intended to seek coverage under Evanston's policy for other claims. At oral argument, Dietz's attorney additionally asserted that Evanston's letter accepting tender of the Medina action stated that it might assert as a defense to coverage that Dietz had known about other claims earlier. In fact, Evanston's letter stated that it "underst[ood] that Dietz was aware of the embezzlement prior to the policy period," raising "a concern that Dietz was aware of *the potential Medina claim prior to the policy period*." (Hochhausler Decl., Exh. A (November 14, 2007 letter) (emphasis added).)

93. Def.'s Facts, ¶¶ 23–24, 71–119; Pl.'s Facts, ¶¶ 23–24, 71–119.

94. Def.'s Facts, ¶ 24; Pl.'s Facts, ¶ 24.

Similarly, while Dietz seeks recovery of expenses incurred "investigat[ing] and adjust[ing] claims not related to the Medina claim," it fails to identify the expenses.[95] The court assumes these costs include, at a minimum, the attorneys' fees Sands & Associates submitted to Evanston for payment that Evanston declined to pay.[96] These fees were generated in connection with a preliminary investigation of Estrada's embezzlement and were rejected by Evanston because they were incurred prior to tender of the Medina claim and Evanston's agreement to defend that claim.[97] Recoupment of such fees is precluded by the policy's no-voluntary payments provision. See *Faust*, 55 F.3d at 473 (affirming a grant of summary judgment based on a finding that there was no coverage for attorneys' fees and defense costs incurred prior to the tender of a claim under a no-voluntary payments provision). If Dietz did incur post-tender investigation costs, adjustment costs or fees—as opposed to settlement costs—related to the non-Medina claims, it has failed to adduce any evidence of them. As a consequence, counsel's reference to such expenses provides no basis for denying Evanston's motion for summary judgment.

### a. Whether the No–Voluntary Payments Clause Is Ambiguous or Requires a Showing of Prejudice

Dietz argues that the language of the no-voluntary payments provision is ambiguous given its proximity in the policy to the contract's cooperation clause. It also asserts that a showing of prejudice is necessary before Evanston can deny coverage based on the clause.[98] The no-voluntary payments provision is included in a section of the policy captioned "Assistance and Cooperation of the Insured." This section states:

> "The Insured shall give full assistance and cooperation to the Company as respects all claims made against the Insured at the Insured's expense. The Insured shall not, except at [its] own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the written consent of the Company."[99]

Because the no-voluntary payments language is found in a section of the policy that also requires the insured to cooperate with the insurer, Dietz asserts that Evanston's motion is based on the cooperation clause, rather than the no-voluntary payments clause. It contends: "The tactical choice of Evanston to rely **solely** upon the cooperation clause is fatal to the motion. The clause relied upon by Evanston is under the heading 'Assistance and Cooperation of the Insured.'"[100] The import of this assertion is that Evanston has failed to show that it was prejudiced by Dietz's voluntary payments.[101]

This attempt at misdirection is directly contradicted by Evanston's moving papers, which assert that "the voluntary payments

---

95. Opposition at 10.

96. In support of its assertion that it is entitled to reimbursement of such expenses, Dietz notes that "Sands continued to send invoices for unpaid bills to Evanston." (*Id.*) The record does not reflect that Dietz submitted any other investigation-related costs to Evanston for payment.

97. Def.'s Facts, ¶ 49; Pl.'s Facts, ¶ 49.

98. Opposition at 1–2, 12–16.

99. Def.'s Facts, ¶¶ 1–3; Pl.'s Facts, ¶¶ 1–3; Fischer Decl., Exh. B (2006/2007 Policy) at 41.

100. Opposition at 13 ("Dietz can only oppose and brief the theories *chosen by Evanston.* The 'lead authority' cited by Evanston ... holds that a 'cooperation clause' is subject to the prejudice rule. No prejudice is claimed in the separate statement" (emphasis original)).

101. *Id.*

provision in the Evanston policy precludes any obligation for Evanston to reimburse Dietz." [102] Evanston's brief makes no mention of the cooperation clause. To the extent Dietz argues that the proximity of the no-voluntary payments and cooperation clauses makes the notice-prejudice rule applicable to the no-voluntary payments provision, the California Court of Appeal has rejected a similar argument. See *Belz v. Clarendon America Ins. Co.,* 158 Cal.App.4th 615, 632–33, 69 Cal. Rptr.3d 864 (2007) (rejecting an insurer's argument that a notice provision was in fact a no-voluntary payments clause "because of its location in the policy" and stating: "We agree with Clarendon that the first sentence is a traditional no-voluntary-payment provision. But the placement of the two sentences in the same paragraph, albeit next to one another, does not mean we should ignore the plain meaning rule in construing the applicable language of the second sentence. As explained above, that language is a notice provision, not a prohibition on voluntary payments").

Dietz also asserts there is ambiguity in the cooperation clause, and that it infects the no-voluntary payments provision as well. [103] As the *Belz* court noted, the fact that the two provisions are found in the same paragraph does not mean that the court should ignore the plain meaning of the no-voluntary payments clause. Multiple courts have concluded that that provision unambiguously bars coverage for payments to which an insurer that has not denied coverage has not consented. See *Jamestown Builders, Inc.,* 77 Cal.App.4th at 345, 91 Cal.Rptr.2d 514 (affirming the denial of coverage for payments made prior to tender where the policy included a no-voluntary payments clause stating that "[s]hould any claim or suit to which this

policy applies appear likely to exceed the Retained Limit, no loss expenses or legal expenses shall be incurred on behalf of the company without its prior consent"). See also *Faust,* 55 F.3d at 472 (affirming a grant of summary judgment based on a finding that there was no coverage for attorneys' fees and other defense costs incurred prior to the tender of a claim under a no-voluntary payments provision). Moreover, Dietz's proposed interpretation of the cooperation clause makes little sense. Dietz argues that the cooperation clause is ambiguous because the phrase "all claims made against the Insured at the Insured's expense" suggests that there is a class of covered claims that the insured, rather than the insurer, pays. If the insured is paying a claim, it would not tender the claim to the insurer, and there would be no need for the insured to cooperate with the insurer in investigating or resolving the claim. Rather, the clause appears to require that the insured assist the insurer "at [its own] expense." In any event, any ambiguity in the cooperation clause does not render the no-voluntary payments clause unclear.

■ While Dietz is correct that a showing of prejudice is needed to deny coverage under a cooperation clause, prejudice is not required to deny coverage under a no-voluntary payments clause. See *Insua,* 104 Cal.App.4th at 746, 129 Cal.Rptr.2d 138 (prejudice is "not part of the equation in evaluating denial of pre-tender costs" under the no-voluntary payments clause); *Truck Ins. Exch. v. Unigard Ins. Co.,* 79 Cal.App.4th 966, 977, 94 Cal.Rptr.2d 516 (2000) ("[U]nlike a notice provision or a cooperation clause, a no-voluntary-payment provision can be enforced without a showing of prejudice"). See also *Faust,* 55 F.3d at 472–473 ("Cali-

---

**102.** Motion at 25.

**103.** Opposition at 1–2.

fornia courts consistently enforce no-voluntary-payment provision in absence of prejudice, but prejudice is necessary to enforce notice provision or cooperation clause").[104]

### b. Whether the Payments Made Were Voluntary

■■■ Dietz next contends that the payments it made to its clients were not "voluntary" because they were an economic necessity.[105] As noted, "California law enforces ... no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances." *Low*, 110 Cal.App.4th at 1546, 2 Cal.Rptr.3d 761. "[E]ven if the policy contains a no voluntary payments provision, pre-tender expenses are not barred if they were incurred involuntarily." *Tradewinds Escrow v. Truck Ins. Exch.*, 97 Cal.App.4th 704, 710–12, 118 Cal. Rptr.2d 561 (2002) (citing *Fiorito v. Superior Court*, 226 Cal.App.3d 433, 440, 277 Cal.Rptr. 27 (1990)). Where there is no genuine dispute as to any material fact, the voluntariness of unauthorized payments can be decided as a matter of law. See *Faust*, 55 F.3d at 473 ("[T]he district court did not err in concluding that no genuine dispute of material fact existed as to the voluntariness of the pre-tender costs and that Travelers was thus entitled to judgment on this issue as a matter of law").

■■■ As evidence that the payments were an economic necessity, Dietz asserts there was a pressing need to pay its clients, many of whom faced catastrophic losses and it was "busy paying [the claims] off." [106] At oral argument, its attorney cited the fact that Lettiere "didn't think to do anything other than try to get his business to survive.... [I]mmediately after the embezzlement, ... the business was a complete mess. He was scrambling to run from emergency to emergency to emergency, and he never went through the logical or intellectual steps of comparing policies ... and thinking what it is I'm going to do." [107] He also contended that, although Lettiere is a sophisticated claims adjuster, he is not an expert on errors and omissions coverage. These arguments are similar to those rejected by the court in *Jamestown Builders*.

There, a developer built housing tracts that contained several hundred homes. Many of the individuals who purchased the homes were dissatisfied with the construction. The court noted that "complaints began as a trickle in the late 1980's, but intensified in the early 1990's as more homeowners demanded that Jamestown fix the problems and compensate them for damages. Jamestown was faced with a 'deluge of problems.'" 77 Cal.App.4th at 344, 91 Cal.Rptr.2d 514. The developer paid approximately $1,240,000 for repairs and damages between June 1991 and June 1993, but did not tender any of the claims to its insurer. *Id.* It offered two reasons for its failure to do so. First, it asserted

---

**104.** At oral argument, Dietz's counsel appeared to assert that "late notice" by the insured is an essential element of any no-voluntary payments defense, and thus the insurer must show prejudice to prevail. While the insured's delay in tendering the claim until after payments have been made is obviously a factual component of a no-voluntary payments defense, courts have clearly rejected attempts to engraft the notice-prejudice rule onto the defense. See *Insua*, 104 Cal. App.4th at 746, 129 Cal.Rptr.2d 138.

**105.** *Id.* at 11–12 ("All of Dietz's clients suffered property losses, and each was faced with a closed business, damaged home or other loss of property").

**106.** Cope Decl., Exh. 3 (Lettiere Deposition) at 36:6–37:5.

**107.** Reporter's Rough Transcript of Hearing, August 30, 2010 at 11.

that "it was inordinately preoccupied with the magnitude of the remedial work. As its counsel explained during oral argument below, 'Did our client go forth and get the consent required and ask to incur these costs from General Star? I don't believe they did. And we think we have at least provided an explanation they were in the midst of going through and repairing God knows how many homes because of all the problems that we had.' " *Id.* at 344–45, 91 Cal.Rptr.2d 514. Second, the developer argued that it was under the erroneous belief that the policy would not provide coverage for the expenses, and that coverage " 'wasn't [its] focus.' " *Id.* at 345, 91 Cal.Rptr.2d 514.

The court acknowledged that "an insured may be able to avoid application of a no-voluntary-payments provision where the previous payments were made involuntarily because of circumstances beyond its control." *Id.* at 348, 91 Cal.Rptr.2d 514. It found no such circumstances in the case before it, however. In this regard, the court disagreed with the developer's suggestion that " 'it was under a legal obligation to make th[e] repairs,' " and that, " 'had [it] chosen to simply ignore the complaints of these homeowners, it most certainly would have been a defendant in multiple lawsuits, which would have driven up the costs to the insured and to its insurance carriers.' " *Id.* at 349 n. 4, 91 Cal.Rptr.2d 514. Rather, the court stated, the developer had "another option: It could have tendered the matter to General Star, thereby allowing the insurer to negotiate with the homeowners, involve other insurance carriers or involve the subcontractors and their insurance carriers." *Id.* See also *Scottsdale Ins. Co. v. Homestead*

*Land Development Corp.,* 145 F.R.D. 523, 537 (N.D.Cal.1992) (holding that payments made during a 25–day delay in tendering were involuntary despite the insured's argument that "its counsel was so busy during this period that it could not find time to write the tender letter and . . . [that it] anticipated that Scottsdale would reject the tender even if made").

■ Dietz learned of Estrada's embezzlement in April 2006,[108] and filed a police report indicating total losses of more than $2 million on November 26, 2006.[109] Dietz did not even mention claims other than the Medina action to anyone associated with Evanston until the Medina settlement conference on May 30, 2008—more than two years after it had discovered the embezzlement.[110] When asked why Dietz had delayed seeking reimbursement, Dietz's president stated that he "was busy paying the [claims] off. I had no real thoughts about whether there was even coverage for me under this . . . . [I]t never entered into my mind to pursue it until Mr. Belcher and I met and he realized that that was our last venue to go through."[111] Failure to investigate and assess potential coverage does not support a finding that payments made prior to tender were involuntary. See *Jamestown,* 77 Cal.App.4th at 349, 91 Cal.Rptr.2d 514 ("Jamestown's ignorance of its policy rights does not extend the time in which it was required to take action").

During the two years that preceded its first mention of potential claims other than Medina to Evanston, Dietz investigated Estrada's embezzlement, pursued actions against her and her accountant, and nego-

---

108. Def.'s Facts, ¶ 10; Pl.'s Facts, ¶ 10.

109. Def.'s Facts, ¶ 20; Pl.'s Facts, ¶ 20.

110. Lettiere said: "We didn't notify Evanston, I guess, other than at the time of the

Medina thing, [during] which I indicated we had various claims still outstanding." (Cope Decl., Exh. 3 (Lettiere Deposition) at 55:16–18.)

111. *Id.* at 36:6–37:5.

tiated numerous settlements with clients. Lettiere tactily admits that Dietz did not even consider seeking insurance coverage for the claims until its efforts to recoup its losses from Estrada and her accountant failed, and it concluded "[t]here was no one else to go after." [112] Given these facts, no reasonable jury could find that Dietz's payments were involuntary.[113]

In sum, neither Dietz's desire to preserve its business, nor its failure to focus on whether it had coverage for the claims constitutes economic necessity or other extraordinary circumstances that excuses its failure to tender the claims to Evanston.[114] See *Faust*, 55 F.3d at 473 ("Faust argues that the urgency of the situation presented by the Adizes lawsuit, particularly the plaintiffs' requests for a temporary restraining order and preliminary injunction, prevented Faust from taking the time to tender defense of the action to Travelers. In fact, however, Faust offers no plausible reason for the more than four-month-long delay before the tender. Even assuming Faust had to immediately retain counsel to counter the TRO motion, Faust offers no explanation for why it or its counsel could not have prepared and sent a tender letter to Travelers in the days or weeks following the filing and service of the first Adizes action"). Accordingly, the court finds that Dietz's payments were voluntary as a matter of law.

### c. Conclusion Regarding Application of the No–Voluntary Payments Clause

For the foregoing reasons, the court finds that Dietz is not entitled to reimbursement of amounts paid to resolve the non-Medina claims nor fees incurred investigating the Estrada embezzlement. The payments were voluntary as they were made at a time when Evanston had neither authorized the payments nor denied a tender.

---

**112.** *Id.*

**113.** Dietz argues that voluntariness is a question of fact that should be decided by a jury. It cites the fact that the trial court denied summary judgment in *Insua*, finding that there were triable issues of fact as to whether plaintiff's failure to tender the claim before paying defense costs was voluntary. See 104 Cal.App.4th at 741, 129 Cal.Rptr.2d 138. *Insua* is distinguishable, however, since there plaintiff alleged that he had been unable to find the policy, and intimated that he had to defend the action before tendering the claim or risk forfeiting legal rights. *Id.* at 740, 129 Cal.Rptr.2d 138. Because Dietz proffers no evidence suggesting that it was unable to find the policy or identify its insurer, or that it was prevented in some way from making a timely tender of the claim, there are no triable issues of fact as to voluntariness.

**114.** As Evanston notes in reply, the two cases that have entertained an argument that pretender payments were "involuntary" concerned situations in which the insured's delay in tendering was allegedly due to difficulty locating the policy or identifying the insurer. See *Shell Oil Co. v. National Union Fire Ins. Co.*, 44 Cal.App.4th 1633, 1649, 52 Cal. Rptr.2d 580 (1996) (holding that there were "substantial difficulties ... characterizing" the insured's payment of defense costs as voluntary because it "was unaware either of its insurer's identity, the contents of the policy, or both"); *Fiorito*, 226 Cal.App.3d at 436, 277 Cal.Rptr. 27 (holding that payments to counsel to defend an action during a four month period prior to tender might not be voluntary because the insureds were searching for their policies). See also *Jamestown*, 77 Cal. App.4th at 348, 91 Cal.Rptr.2d 514 ("This situation might occur where the insured is unaware of the identity of the insurer or the contents of the policy"). Where plaintiffs have "had ample time to review the policy, investigate the claims, and tender them" to the insurer, courts have characterized unauthorized payments as voluntary. *Jamestown*, 77 Cal.App.4th at 348, 91 Cal.Rptr.2d 514. See also *Northern Ins. Co. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir.1992) ("This was not an instance in which the defense had to begin before the insured had time to identify the insurer and then tender the defense").

### D. Whether Evanston Fully Indemnified Dietz in the Medina Litigation

Evanston next contends that it fully indemnified Dietz in the Medina litigation, and that Dietz has adduced no evidence raising a triable issue of fact regarding its claim that it is entitled to further reimbursement of attorneys' fees and costs associated with the litigation. The policy requires Evanston to "pay on behalf of [Dietz] all sums in excess of the deductible amount stated in the Declarations which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD." [115] Evanston contends it met its obligations under this provision by funding the Medina settlement and paying $25,288.15 to Sands & Associates for its services as Dietz's independent defense counsel in the case.[116]

It is not clear that Dietz opposes this portion of Evanston's motion. Although it notes in its opposition the existence of a billing dispute between Evanston & Sands, it states only that "a significant amount of effort was expended to investigate and adjust claims *not* related to Medina," and that "Sands continued to send invoices for unpaid bills to Evanston." [117] This statement suggests that Dietz seeks to recoup fees associated with the Sands firm's initial investigation of Estrada's embezzlement; it adduces no evidence regarding the specific fees sought that contradicts this suggestion. Evanston declined to pay these fees because they were incurred prior to tender,[118] and the court has found as a matter of law that Evanston had no duty to reimburse pre-tender expenses under the no-voluntary payments clause.

To the extent Dietz contends that Evanston's $185 per hour rate cap was unreasonable, because it did not reflect "rates which [were] actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the [Medina] claim arose or [was] being defended," this is not the appropriate forum in which to raise the issue. See CAL. CIV.CODE § 2860(c) ("Any dispute concerning attorney's fees not resolved by these methods shall be resolved by final and binding arbitration by a single neutral arbitrator selected by the parties to the dispute"). More fundamentally, Dietz has adduced no evidence regarding the rates Evanston paid for the defense of similar actions in the community, and it has thus failed to raise a triable issue of fact defeating summary judgment. See *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505 (If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial").[119]

---

**115.** Def.'s Facts, ¶ 5; Pl.'s Facts, ¶ 5.

**116.** Def.'s Facts, ¶ 44; Pl.'s Facts, ¶ 44; Def.'s Facts, ¶ 51; Pl.'s Facts, ¶ 51.

**117.** Opposition at 8–9 (emphasis added).

**118.** Def.'s Facts, ¶ 49; Pl.'s Facts, ¶ 49.

**119.** In its statement of genuine issues, Dietz asserts that it waived the fee Medina owed it for services as part of the settlement of litigation with her. (Def.'s Facts, ¶ 44; Pl.'s Facts, ¶ 44.) Dietz does not indicate, however, why Evanston was required to reimburse it for this fee. The policy required Evanston to pay only those sums "which the Insured shall become legally obligated to pay as damages." (Def.'s Facts, ¶ 5; Pl.'s Facts, ¶ 5.) Had Dietz sought to recover the commission from Medina, this would have been the subject of a cross-complaint against Medina, and Evanston would have had no obligation to prosecute that cross-complaint on Dietz's behalf. See, e.g., *James 3 Corp. v. Truck Ins. Exchange,* 91 Cal.App.4th 1093, 1104–06, 111 Cal.Rptr.2d 181 (2001) (liability insurer was not obligated to fund and prosecute cross-complaints on its insured's behalf even if they were factually intertwined with the action against the insured); *Barney v. Aetna Casualty & Surety Co.,*

## III. CONCLUSION

For the reasons stated, the court grants defendant's motion for summary judgment on plaintiff's claims for breach of contract and declaratory relief. The court has determined that Evanston's denial of the non-Medina claims based on the no-voluntary payments provision did not breach the insurance contract. Because Evanston had no duty to indemnify or defend Dietz in other than the Medina action, and because Dietz has raised no triable issues of fact regarding Evanston's failure to satisfy its defense and indemnity obligations in that case fully, Dietz's claim for bad faith also fails. See *Waller*, 11 Cal.4th at 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("It is clear that if there is no potential for coverage ..., there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer").

185 Cal.App.3d 966, 975, 230 Cal.Rptr. 215 (1986) (an insurer has no contractual duty to file a cross-complaint); *3250 Wilshire Boulevard Bldg. v. Employers Ins. of Wausau*, 39 Cal.App.4th 1277, 1280, 46 Cal.Rptr.2d 399 (1995) (an insurer defending a counterclaim had no duty to prosecute the insured's affirmative claims).